IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

Y.B. et al.                       :

                                  :

    v.                            :    Civil Action No. DKC 12-0278

                                  :

BOARD OF EDUCATION OF PRINCE      :
GEORGE'S COUNTY et al.            :


**MEMORANDUM OPINION**

Presently pending and ready for resolution in this action arising under the Individuals with Disabilities Act ("IDEA"), 29 U.S.C. §§ 1400 *et seq.*, is the motion for summary judgment filed by Defendants Board of Education of Prince George's County ("the Board") and Dr. William Hite (collectively, "Defendants") (ECF No. 9).  The relevant issues have been briefed, and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary.  For the reasons that follow, the motion will be granted.

**I.  The Individuals with Disabilities Education Act**

The IDEA and its accompanying regulations, 34 C.F.R. §§ 300 *et seq.*, require all states that receive federal funds for education to provide each child between the ages of three and twenty-one, who has a disability, with a free, appropriate public education ("FAPE").  20 U.S.C. § 1412(a)(1)(A).

Maryland's regulations governing the provision of a FAPE to children with disabilities in accordance with the IDEA are found in the Code of Maryland Regulations beginning at 13A § 05.01.

The FAPE guaranteed by the IDEA must provide a disabled child with meaningful access to the educational process. *Bd. of Educ. of the Henrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 192 (1982). The FAPE must be reasonably calculated to confer "some educational benefit" on the disabled child. *Sumter Cnty. Sch. Dist. 17 v. Heffernan* ex rel. *T.H.*, 642 F.3d 478, 484 (4th Cir. 2011). The benefit must also be provided in the least restrictive environment ("LRE") appropriate to the child's needs, with the disabled child participating to the "maximum extent appropriate" in the same activities as his or her non-disabled peers. 20 U.S.C. § 1412(a)(5)(A); *see also* 34 C.F.R. § 300.114. The IDEA does not require that a school district provide a disabled child with the best possible education, *Rowley*, 458 U.S. at 192, or that the education maximize each child's potential, *Hartmann by Hartmann v. Loudoun Cnty. Bd. of Educ.*, 118 F.3d 996, 1001 (4th Cir. 1997). The benefit conferred, however, must amount to more than trivial progress. *See Reusch v. Fountain*, 872 F.Supp. 1421, 1425 (D.Md. 1994) (explaining that *Rowley*'s "some educational benefit prong will not be met by the provision of de minimis, trivial learning

opportunities." (citing *Hall v. Vance Cnty. Bd. of Educ.*, 774 F.2d 629, 635 (4th Cir. 1985))).

To assure delivery of a FAPE, the IDEA requires a school district to provide an appropriate Individualized Education Program ("IEP") for each child determined to be learning disabled.  20 U.S.C. § 1414(d).  That IEP is formulated by a team ("IEP team") consisting of the parents or guardian of the child, a representative of the school district, the student's regular and special education teachers, an individual who can interpret results of evaluations of the student, and, when appropriate, the student himself.  20 U.S.C. § 1414(d)(1)(B); Md. Code Regs. 13A § 05.01.07(A).  The IEP must state the student's current educational status, annual goals for the student's education, which special educational services and other aids will be provided to the child to meet those goals, and the extent to which the child will be "mainstreamed," i.e., spend time in regular school environments with non-disabled students.  20 U.S.C. § 1414(d)(1)(A).

The IDEA provides a series of procedural safeguards "designed to ensure that the parents or guardian of a child with a disability are both notified of decisions affecting their child and given an opportunity to object to those decisions." *MM* ex rel. *DM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523,

527 (4th Cir. 2002) (internal quotation marks and citation omitted); *see generally* 20 U.S.C. § 1415. Among those safeguards, a parent must be provided prior written notice of a decision to propose or change the educational placement of a student. Md. Code Regs. 13A § 05.01.13(B). A parent may also request a meeting at any time to review and, as appropriate, revise the student's IEP. *Id.* § 05.01.08(B)(3).

If the parents are not satisfied with the IEP, they may "present complaints with respect to any matter related to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such child." 20 U.S.C. § 1415(b)(6). After such a complaint has been received, the parents also are entitled to request a due process hearing conducted by the state or local educational agency. *Id.* § 1415(f). In Maryland, the Maryland Office of Administrative Hearings ("OAH") conducts the due process hearing. Md. Code Ann., Educ. § 8-413(d); Md. Code Regs. 13A § 05.01.15(C)(1). Any party can then appeal the administrative ruling to federal or state court. Md. Code Ann., Educ. § 8-413(j).

When a FAPE is not provided to a disabled student, the student's parents may seek an award of "compensatory education." *G.* ex. rel. *R.G. v. Fort Bragg Dependent Schs.*, 324 F.3d 240, 253-54 (4th Cir. 2003). These educational services are "ordered

by the court to be provided prospectively to compensate for a past deficient program," i.e., the school system's failure to provide the student with a FAPE. *Id.* at 253.

## II.  Background

### A.  Factual Background

Y.B. was born in Tver, Russia in 1992.   After Russian authorities identified his parents as neglectful and they relinquished their parental rights, Y.B. lived briefly with relatives before being sent to live in various orphanages.   In July 2003, when Y.B. was eleven years old, R.B. and G.B. ("Y.B.'s parents") adopted him in what was considered a high-risk international adoption.[1]

R.B. and G.B. initially enrolled Y.B. in a Catholic school, but they transferred him to the Prince George's County school system following his second semester of sixth grade.   By his eighth grade year, Y.B. had begun receiving special education services based on his diagnosis of attention deficit hyperactivity disorder.   Subsequent evaluations also determined that Y.B. suffered from depressive disorder, oppositional defiant disorder, and reactive attachment disorder.

_____

[1]  They simultaneously adopted M.B., Y.B.'s younger biological brother.

As a result of these evaluations, an IEP was developed for Y.B. in August 2007. Y.B. began his ninth grade year that fall at Gwynn Park High School ("Gwynn Park"). At the beginning of the spring semester, Y.B.'s grades slipped, and his parents decided to enroll him in the partial hospital program at Fort Belvoir's Dewitt Army Community Hospital beginning in March 2008. In this outpatient program, Y.B. attended school each weekday and received special education services pursuant to his IEP. He also received individual and group counseling and substance abuse counseling for alcohol and marijuana abuse as part of the program.[2]

A dispute subsequently arose between Y.B.'s parents and the Board regarding Y.B.'s placement for his tenth grade school year. At a due process hearing in August 2008, the parties agreed to place Y.B. at the Frost School, a non-public day school. Y.B.'s IEP for that year provided for twenty-nine hours and ten minutes of special education services from a special education teacher and three hours and twenty minutes of *group* therapy from a mental health counselor per week in a private day school. The IEP also identified Y.B.'s primary disability as emotional disturbance resulting from the disorders previously

---

[2] Dr. Donald Berghman, a child psychiatrist at the hospital, provided at least a portion of this counseling.

identified.   During his first two quarters of the 2008-2009 school year, Y.B. attended school regularly and received A's and B's in all of his courses.   He also continued to receive counseling from Dr. Berghman and was involved in family therapy.

Early in the third quarter of the school year, Y.B. began violating the Frost School's rules, running away from home, and he resumed his use of alcohol and marijuana.[3]   He missed eleven days of school during that quarter and his grades declined significantly.   Indeed, during the last quarter of the year, Y.B. did not even receive grades because he missed thirty days of school.[4]   In May 2009, the Frost School requested a manifest determination review ("MDR") to determine whether Y.B.'s bad behavior was the result of his disability.   At the meeting, which occurred on June 4, 2009, it was determined that Y.B. had received only nine suspensions during the year, instead of the ten suspensions that prompt an MDR.   The meeting was then cancelled.   That same day, however, a functional behavior assessment was conducted, and Y.B.'s IEP team implemented a

---

[3]   In April 2009, Y.B. was charged with possession of marijuana.   After he failed to meet with an intake worker from the Department of Juvenile Services ("DJS") and missed two court dates, the juvenile court issued a warrant for his arrest.

[4]   Y.B.'s absences stemmed from both unexcused absences and numerous out-of-school suspensions for failure to comply with school rules.

behavior intervention plan shortly thereafter.[5]   Due to Y.B.'s repeated violation of school rules and lack of attendance, the Frost School discharged Y.B. at the end of the school year in June 2009.   He received half credits for the coursework he had completed during the first two quarters of the school year.

A central IEP ("CIEP") meeting was held on July 14, 2009. At that meeting, it was recommended that YB continue to receive approximately twenty-nine hours of special education weekly, along with one hour of *individual* counseling services.[6]   Y.B.'s parents requested that Y.B. be placed in a full-time residential school, but the school system determined that the least restrictive environment for implementing his IEP was a private day school.   It then suggested several schools that it believed would be appropriate, including the Leary School in Virginia.[7] During the meeting, Y.B.'s parents also asked the team to have

---

[5]   The functional behavior assessment examines the content, pattern, and function of the student's behavior.   The IEP then uses this assessment to develop an effective behavior implementation plan, which sets forth appropriate behavior goals and strategies for achieving those goals.

[6]   Y.B. had indicated that he disliked group therapy. Indeed, he had often acted out during his group therapy sessions at the Frost School.

[7]   The Leary School's program included a vocational component in which students worked on a construction job site at the school.   Y.B. had previously expressed an interest in working in construction following the completion of high school.

YB evaluated by a psychologist to determine whether a non-public day school was adequate to meet his educational needs. On July 27, 2009, Y.B. met with Dr. William Young, a psychologist for Prince George's County. Dr. Young concluded that Y.B. was properly characterized as suffering from emotional disturbance and that he needed special education services in a small educational environment. He did not, however, conclude that Y.B. required a residential placement in order to obtain educational benefit.[8]

Y.B.'s parents thereafter applied to the Leary School, and his application was accepted. The 2009-2010 school year was scheduled to begin on September 8, 2009. Y.B. ran away from home on September 1, 2009, and did not return until Thanksgiving Day. Immediately following his return, Y.B. was detained by DJS at Cheltenham Youth Facility ("Cheltenham") for one night before being committed by the juvenile court to the Alfred D. Noyes Children Center ("Noyes") for residential care.[9]

While at Noyes, at the request of DJS, Y.B. underwent another psychological evaluation. The results indicated that

---

[8] The CIEP team subsequently met to evaluate Dr. Young's findings and determined that Y.B.'s IEP for the 2009-2010 year did not need to be updated.

[9] The record indicates that this placement was unrelated to Y.B.'s educational needs.

Y.B.'s cognitive skills and intellectual functioning were in the average range, but that he was at high risk for future delinquent behavior.  Dr. Carter, the psychologist performing the evaluation, recommended that Y.B. return home on electronic monitoring with family therapy, individual counseling, and intensive substance abuse treatment.  Y.B. performed well academically during the quarter that he attended Noyes, receiving B's in all of his courses except physical education, in which he received an A.

Y.B. was released from Noyes in February 2010 and began attending the Leary School in mid-March of that year.  He earned B's in all of his courses.  He received at least one hour per week of individual counseling as required by his IEP.  Y.B.'s counselor indicated that he made progress on each of the goals listed on his IEP during the third and fourth quarters of the school year, including with his ability to manage emotions and demonstrate constructive problem-solving skills.  His IEP team met on April 29, 2010, to discuss this progress and to develop an IEP for the 2010-2011 school year.  Based on Y.B.'s performance at Noyes and the Leary School, the IEP again recommended approximately twenty-nine hours of special education services and one hour of individual therapy per week in a non-public day school.

Although Y.B.'s IEP provided for extended school year ("ESY") services, meaning that Y.B. would attend school throughout the year, Y.B. attended only seven days of the summer session at the Leary School.  As a result, he received an "incomplete" grade for each of his three summer courses.  In August 2010, DJS detained Y.B. at Cheltenham for electronic monitoring violations.  He was released, however, for the start of the 2010-2011 school year at the Leary School and attended approximately three weeks before again being detained for additional monitoring violations.  Y.B. remained at Cheltenham from October through December 2010.[10]  DJS then transferred him to the Jefferson School, a twelve-month residential treatment center with a separate day school.[11]  Y.B.'s report card for his first two months at the Jefferson School showed four A's, one C, and one F.[12]

Y.B.'s IEP team met in March 2011.  The team recommended that Y.B. receive thirty hours of special education services per

_____

[10] At approximately the time that DJS detained Y.B., the Leary School discharged him as a student.

[11] The record demonstrates that DJS placed Y.B. at Jefferson for purposes of "medical necessity," not due to his educational needs.

[12] Y.B.'s failing grade was in Spanish.  He apparently informed his Spanish teacher that he did not want to learn an additional language.

week, along with one hour of counseling.  In addition to the requirements of the IEP, the Jefferson School offered Y.B. group counseling and family therapy services.  On July 1, 2011, the Jefferson School discharged Y.B. from its residential program because he was psychiatrically stable and no longer demonstrated a medical necessity for the level of care that the school provided.  The school did recommend that Y.B. receive substance abuse treatment, and DJS subsequently transferred him to Mountain Manor, an in-patient treatment facility in Baltimore.[13]  From early July through mid-August 2011, Y.B. was treated at Mountain Manor.  During this time, he received ESY services in accordance with his IEP from the Baltimore Academy.

On August 19, 2011, Y.B.'s IEP team met to discuss his placement for the 2011-2012 school year.  The Board proposed referring Y.B. to the Pathways School, a non-public day school in Hyattsville, Maryland, that specializes in providing transitional services for students with special education needs.  At that time, Y.B. had passed all of his high school assessments except for biology and needed only four additional credits to

_____

[13]  During his stay at the Jefferson School, Y.B. was arrested and charged as an adult for possession of a controlled dangerous substance after he purchased prescription medication from another student.  At the time of the administrative hearing, those charges were still pending.  Neither party has provided information here regarding whether those charges have since been resolved.

receive a high school diploma.  Y.B.'s parents, however, refused
to sign a consent form granting the school system permission to
send a referral packet to the Pathways School.[14]

   B.   **Procedural Background**

   On June 28, 2011, just prior to Y.B.'s discharge from the
Jefferson School, Y.B.'s parents filed a due process complaint
with  the  OAH.    That  complaint  primarily  requested  Y.B.'s
placement in a full-time residential program and compensatory
educational services for the school system's purported failure
to provide Y.B. with a FAPE during the 2008-2009, 2009-2010,
2010-2011, and 2011-2012 school years.  The parties attended a
resolution meeting on July 11, 2011, but they were unable to
resolve their dispute.  Approximately one month later, R.B. and
G.B. filed a motion with Administrative Law Judge Sondra Spencer
("the ALJ") to request that Y.B. be placed at the Jefferson
School pending resolution of their due process complaint.  The
ALJ denied this motion, and the due process hearing was held on
September 8-9, 12-13, and 16, 2011.

---

   [14] They said that a representative from a Pathways program
had previously told them that the program could not meet Y.B.'s
needs.  It appears that the basis for this statement was a 2009
statement from the representative that this particular Pathways
program  did  not  have  psychologists  on  staff  to  provide
counseling to Y.B. as required by his IEP.  The record reveals,
however, that the Pathways School recommended at the August 2011
meeting  involved  a  different  school  providing  different
services.

13

The ALJ framed the issues presented to her as follows:

> (1) Did the Student's Individualized Education Programs . . . for the 2009-2010, 2010-2011, and 2011-2012 school years and proposed placement in a separate nonpublic day school afford the Student a free appropriate public education in the least restrictive environment or is placement in a residential treatment center required to afford the Student educational benefit?
>
> (2) Is the Student entitled to compensatory education services?

(ECF No. 9-2, ALJ Opinion, at 2).  On September 29, 2011, the ALJ issued her opinion in the case.  She concluded that Y.B.'s parents had failed to prove that the Board did not offer Y.B. a FAPE for the 2009-2010, 2010-2011, and 2011-2012 school years, and subsequently denied their request for compensatory education services and reimbursement.[15]  At that time, Y.B. had not yet attended school during the 2011-2012 school year.  On December 5, 2011, he again enrolled at the Frost School.

Y.B., through his parents (collectively, "Plaintiffs"), filed an appeal to this court on January 27, 2012, naming the

_____

[15] Although not explicit within the issues set forth in the ALJ's opinion, the ALJ did conclude that Y.B.'s placement at the Frost School during the 2008-2009 school year was appropriate and that his lack of progress in that program during the spring semester of 2009 was due to his own failure to attend school.

Board and Dr. Hite, the Superintendent of the Board, as Defendants. (ECF No. 2). Defendants filed the pending "motion for summary judgment" approximately six weeks later. (ECF No. 9). Plaintiffs generally opposed the motion as premature, but they did not respond to the merits of the arguments presented by Defendants.[16]

## III. Defendants' Motion for Summary Judgment

Although titled as a motion for summary judgment, the motion submitted by the Board and Dr. Hite implicates two standards of review. (ECF No. 9). Defendants first request that the court dismiss all claims against Dr. Hite as "redundant" because Plaintiffs have sued the Board as well as Dr. Hite in his official capacity. (ECF No. 9-3, at 14) (internal quotation marks omitted). They then request that the court enter summary judgment in the Board's favor because the ALJ correctly concluded that its selection of a non-public day school placement for the 2008-2009, 2009-2010, 2010-2011, and 2011-2012 school years provided Y.B. with a FAPE. These requests will be analyzed separately.

---

[16] The court subsequently received a copy of the administrative record of all proceedings that occurred in the OAH.

**A.   All Claims Against Dr. Hite Will Be Dismissed Because They Are Duplicative of the Claims Against the Board**

Defendants' request for dismissal of the claims against Dr. Hite is properly analyzed under Federal Rule of Civil Procedure ("Federal Rule") 12(b)(6).  *McCachren v. Blacklick Valley Sch. Dist.*, 217 F.Supp.2d 594, 597-98 (W.D.Pa. 2002).  The purpose of a motion to dismiss pursuant to this rule is to test the sufficiency of the complaint.  *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).  A plaintiff's complaint need only satisfy the standard of Rule 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed.R.Civ.P. 8(a)(2).  Nevertheless, "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007).  That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).  At this stage, the court must consider all well-pleaded allegations in a complaint as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and must construe all factual allegations in the light most favorable to the plaintiff, *see Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir.

16

1999) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)).

Defendants assert that all claims against Dr. Hite, who Plaintiffs have sued solely in his official capacity as the Superintendent of the Board (ECF No. 2 ¶ 8), should be dismissed as redundant of their claims against the Board.[17]   Plaintiffs have not responded to this argument.   "[W]hen [claims] against individual defendants would be duplicative of those against a government entity, which is also sued, the claims against the individuals should be dismissed as the government entity is the real party in interest."   *Blunt v. Lower Merion Sch. Dist.*, 559 F.Supp.2d 548, 568 (E.D.Pa. 2008).   Claims against school board employees in their official capacities are treated as claims against the school board itself.   *Id.*; *Hicks* ex rel. *Hicks v. Halifax Cnty. Bd. of Educ.*, 93 F.Supp.2d 649, 667-68 (E.D.N.C. 1999); *cf. Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978) ("[O]fficial-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent.").   As a result, it is "unnecessary" for Plaintiffs to proceed against both the Board

---

[17] They also emphasize that, "[s]hould the Plaintiffs be successful in obtaining their requested relief, it is . . . the Defendant Board . . . that will be responsible for providing required remedies to the Plaintiffs." (ECF No. 9-3, at 14).

and Dr. Hite in his official capacity.  *Hicks*, 93 F.Supp.2d at 667; *cf. Holmes-Ramsey v. Dist. of Columbia*, 747 F.Supp.2d 32, 42 (D.D.C. 2010) (describing as "redundant" a plaintiff's claims against local government officials in their official capacities when the plaintiff had also sued the local government).  All claims against Dr. Hite will, therefore, be dismissed. *McCachren*, 217 F.Supp.2d at 599.

> **B.  Plaintiffs' Arguments Regarding the Procedural Propriety of the Board's Request for Summary Judgment Are Unpersuasive, and Summary Judgment in the Board's Favor is Warranted**

The Board has requested that the court grant summary judgment in its favor by concluding that the ALJ properly found that its selection of a non-public day school placement for Y.B. during the 2008-2011 school years provided him with a FAPE. Plaintiffs did not address this issue in their opposition papers, instead challenging only the procedural propriety of the Board's summary judgment request.  As explained below, those arguments are without merit.  Additionally, because Plaintiffs wholly failed to demonstrate why the ALJ's conclusion with regard to Y.B.'s placement was irregular, the request for summary judgment will be granted.

1.   **Summary Judgment Standard**

The United States Court of Appeals for the Fourth Circuit
has articulated the following standard of review for motions for
summary judgment in IDEA cases:

> In a judicial proceeding under the IDEA, a
> reviewing court is obliged to conduct a
> modified *de novo* review, giving "due weight"
> to the underlying administrative
> proceedings. In such a situation, findings
> of fact made in administrative proceedings
> are considered to be *prima facie* correct,
> and if a reviewing court fails to adhere to
> them, it is obliged to explain why. The
> court is not, however, to substitute [its]
> own notions of sound educational policy for
> those of local school authorities. . . .

*MM*, 303 F.3d at 530-31 (citations omitted). This standard works
in tandem with general standards of review for summary judgment,
which also apply in IDEA cases, as illustrated in *Bd. of Educ.
of Frederick County v. I.S.* ex rel. *Summers*, 325 F.Supp.2d 565,
578 (D.Md. 2004):

> [T]he Court's analysis is shaped by the
> mandate of Rule 56(c) of the Federal Rules
> of Civil Procedure that summary judgment
> "shall be rendered forthwith if the
> pleadings, depositions, answers to
> interrogatories, and admissions on file,
> together with the affidavits, if any, show
> that there is no genuine issue as to any
> material fact and that the moving party is
> entitled to a judgment as a matter of law."
> "When the moving party has met its
> responsibility of identifying the basis for
> its motion, the non-moving party must come
> forward with specific facts showing that
> there is a genuine issue for trial." *White*

19

*v. Rockingham Radiologists, Ltd.*, 820 F.2d 98, 101 (4th Cir. 1987) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(e)). The Court's function is limited to determining whether sufficient evidence supporting a claimed factual dispute exists to warrant resolution of the matter at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In that context, a court is obligated to consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Plaintiffs face an uphill battle in this case because just as they were required to carry the burden of proof in the administrative hearing, so too must they carry the burden of proof here. *See Schaffer* ex rel. *Schaffer v. Weast*, 546 U.S. 49, 56-62 (2005); *Cavanagh v. Grasmick*, 75 F.Supp.2d 446, 457 (D.Md. 1999).

"If the administrative findings were made in a regular manner and have evidentiary support, they are to be considered *prima facie* correct." *Cavanagh*, 75 F.Supp.2d at 457 (citing *Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 103 (4th Cir. 1991)). Additionally, in giving due weight to the findings of the ALJ, this court "owes deference to the ALJ's determinations of the credibility of witnesses." *Wagner v. Bd. of Educ. of Montgomery Cnty.*, 340 F.Supp.2d 603, 611 (D.Md. 2004). "'[T]he

fact-finder, who has the advantage of hearing the witnesses, is in the best position to assess credibility.'" *Justin G. ex rel. Gene R. v. Bd. of Educ. of Montgomery Cnty.*, 148 F.Supp.2d 576, 588 (D.Md. 2001) (quoting *Bd. of Educ. of Montgomery Cnty. v. Hunter ex rel. Hunter*, 84 F.Supp.2d 702, 706 (D.Md. 2000)); *see also Doyle*, 953 F.2d at 104.

### 2.  Analysis

Plaintiffs set forth three reasons why the Board's request for summary judgment is improper:  (1) the Board did "not cite to a single piece of evidence or testimony" in its motion (ECF No 12, at 1); (2) the Board failed to comply with Local Rule 105.2(c) with regard to the filing of cross-motions for summary judgment; and, (3) summary judgment is premature because the parties have not yet engaged in discovery, which they have a "right" to do in this case (*id.* at 7).  The Board has generally opposed these arguments, asserting that the court may properly resolve its motion at this time by looking to the administrative record.

### a.  The Board's Purported Failure to Cite Evidence

Plaintiffs' first argument – regarding the Board's purported failure to cite specific evidence in support of its request for summary judgment – fails on two fronts.  Initially, this argument misunderstands the nature of the parties' burdens

on summary judgment.   Where the plaintiff has the ultimate burden of proof at trial, as in the present case, a moving defendant is required only to show the absence of a genuine dispute of material fact; it need not affirmatively present evidence to maintain a motion for summary judgment.   The commentary to the recent amendments makes clear that the rule of *Celotex*, 477 U.S. at 323 ("[W]e find no express or implied requirement in [former] Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."), has not changed.   *See* Fed.R.Civ.P. 56(c)(1)(B) advisory committee notes (2010 amendment) ("And a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.").

Additionally, this argument overlooks that the Board has cited to evidence – albeit indirectly – in support of its request for summary judgment.   Indeed, nearly every paragraph in the statement of facts provided by the Board cites specific paragraphs of the ALJ's factual findings as support.   Those paragraphs of the ALJ's opinion, in turn, reference the testimony and exhibits in the administrative record that support the findings of fact. Accordingly, while the Board did not cite

directly to this evidence in its statement of facts, it nonetheless set forth information in its motion indicating where in the underlying record there was support for those facts.

**b.  The Board's Purported Failure to Comply with Local Rule 105.2(c)**

Plaintiffs' contention that the Board failed to comply with Local Rule 105.2(c) when submitting its motion is similarly unavailing.[18]  According to Plaintiffs, the court must deny the Board's request for summary judgment because Defendants did not contact them to set "a briefing schedule to permit each party to file cross-motions for summary judgment in an orderly fashion." (ECF No. 12, at 12).

Local Rule 105.2(c) typically works in tandem with the court's standard scheduling order to address the process for

---

[18] Local Rule 105.2(c) states as follows:

> In a two-party case, if both parties intend to file summary judgment motions, counsel are to agree among themselves which party is to file the initial motion.  After that motion has been filed, the other party shall file a cross-motion accompanied by a single memorandum (both opposing the first party's motion and in support of its own cross-motion), the first party shall then file an opposition/reply, and the second party may then file a reply.  If more than two (2) parties intend to file motions in a multi-party case, counsel shall submit a proposed briefing schedule when submitting their status report.

filing cross-motions for summary judgment. In non-administrative appeal cases, a scheduling order, entered when a case is at issue, directs the parties to submit a status report at the close of discovery, including whether any party intends to file a dispositive motion. Armed with that information, the parties can then propose a schedule for the filing of cross motions. Where, as here, both parties are not prepared to file motions simultaneously, the rule has no application. Plaintiffs essentially concede in their opposition that they will not be prepared to file their own motion for summary judgment unless and until the court permits them to undertake discovery and present supplemental evidence. The rule under which Plaintiffs seek refuge is, therefore, not applicable to the present scenario. Indeed, if Local Rule 105.2(c) was applicable in this circumstance, it would have the perverse effect of requiring parties to undergo potentially unnecessary discovery simply because the non-moving party hoped to file its own summary judgment motion at some unspecified time following discovery. At bottom, Plaintiffs' real dispute stems from the fact that the Board moved for summary judgment prior to discovery. As explained below, that argument – both in the abstract and as applied to this case - is unpersuasive.

c.   **The Board's Request for Summary Judgment Prior to Discovery and Plaintiffs' Rule 56(d) Request**

Plaintiffs maintain that "the filing of a Motion for Summary Judgment" prior to the opportunity for discovery . . . is contrary to the IDEA and the standards for summary judgment." (ECF No. 12, at 2).   This assertion is easily dismissed. Federal Rule 56(b) expressly permits a party to "file a motion for summary judgment at any time until 30 days after the close of all discovery."[19]   Additionally, the language of Rule 56(d) affirmatively demonstrates that Plaintiffs' argument that "it is *per se* improper to grant summary judgment without providing the opponent an opportunity to conduct discovery is without merit." *Reflectone, Inc. v. Farrand Optical Co., Inc.*, 862 F.2d 841, 845 (11th Cir. 1989).[20]

Perhaps recognizing the weakness of their argument regarding the general impropriety of summary judgment prior to

---

[19] The cases cited by Plaintiffs in support of their argument are not to the contrary. Indeed, those cases merely acknowledge that granting summary judgment to a party prior to discovery may not be appropriate in all circumstances. *E.g.*, *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996) (describing the principle that summary judgment should occur after discovery "[a]s a general rule").

[20] Rule 56(d) permits the court to deny summary judgment or delay ruling on a summary judgment motion until discovery has occurred if the "nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition."  Fed.R.Civ.P. 56(d).

discovery, Plaintiffs also invoke Rule 56(d) to request that the court deny the Board's motion for summary judgment as premature. Plaintiffs contend that they "have the right to . . . conduct discovery on [two] issues in this matter which are relevant to the determination of whether Y.B. was offered a [FAPE]":  (1) Dr. Donald Berghman's experience treating Y.B. at the Fort Belvoir DeWitt Army Community Hospital; and (2) Y.B.'s subsequent performance at the Frost School, the non-public day school that he began attending after the ALJ issued her opinion in this case.  (ECF No. 12, at 10).

The Fourth Circuit has strictly interpreted the requirements of Rule 56(d), previously holding that "a reference to Rule 56([d]) and to the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for a Rule 56([d]) affidavit." *Evans*, 80 F.3d at 961.  Thus, "the failure to file an affidavit under Rule 56([d]) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (internal quotation marks and citations omitted); *Amirmokri v. Abraham*, 437 F.Supp.2d 414, 420 (D.Md. 2006), *aff'd*, 266 F.App'x 274 (2008).  And although courts have relaxed the affidavit requirement if the nonmoving party's objection

"served as the functional equivalent of an affidavit," they have done so only where the non-moving party has "adequately informed the district court [why] more discovery is necessary." *Harrods Ltd.*, 302 F.3d at 244-45; *Strag v. Bd. of Trs.*, 55 F.3d 943, 954 (4th Cir. 1995). Here, Plaintiffs' Rule 56(d) request fails at the first step because it contains no affidavit in support of their demand for discovery.

Even setting aside this significant procedural error, the request for discovery fails because Plaintiffs have not demonstrated that the information they seek is necessary to resolve this action. The IDEA permits courts to "hear additional evidence at the request of a party," 20 U.S.C. 1415(i)(2)(C)(ii), but the Fourth Circuit has construed this provision narrowly. As explained in *Springer v. Fairfax County School Board*, 134 F.3d 659, 666-67 (4th Cir. 1998) (citations omitted):

> We construe "additional" in the ordinary sense of the word . . . to mean supplemental. Thus construed, this clause does not authorize witnesses at trial to repeat or embellish their prior administrative hearing testimony; this would be entirely inconsistent with the usual meaning of "additional." We are fortified in this interpretation because it structurally assists in giving due weight to the administrative proceeding, as *Rowley* requires. A lax interpretation of "additional evidence" would "reduce the proceedings before the state agency to a

27

> mere dress rehearsal by allowing appellants
> to transform the Act's judicial review
> mechanism into an unrestricted trial *de
> novo*." . . . A lenient standard for
> additional evidence would have the
> consequence of making the whole IDEA process
> more time consuming, as parties scrambled to
> use the federal court proceeding to patch up
> holes in their administrative case.

Pursuant to this reasoning, courts are advised to limit the introduction of "additional evidence" to circumstances involving, *inter alia*, "unavailability of a witness" or "evidence concerning relevant events occurring subsequent to the administrative hearing." *Town of Burlington v. Dep't of Educ. for Commonwealth of Mass.*, 736 F.2d 773, 790 (1st Cir. 1984), *aff'd*, 471 U.S. 359 (1985). The requesting party bears the threshold burden of demonstrating that the supplemental evidence should be admitted on these bases. *Brandon H.* ex rel. *Richard H. v. Kennewick Sch. Dist. No. 17*, 82 F.Supp.2d 1174, 1179 (E.D.Wash. 2000).

Plaintiffs contend that the court should permit them to seek discovery from Dr. Berghman about inconsistencies that the ALJ identified in the written recommendations he submitted regarding Y.B.'s placement because he was "unavailable" to testify at the due process hearing. (ECF No. 12, at 10). While enticing at first blush, this assertion is ultimately unavailing. Indeed, in determining whether a witness was

"unavailable" for an administrative hearing, the court must look to the reason *why* the witness did not testify, not merely the fact that he did not testify. *Burlington*, 736 F.2d at 791. If the evidence indicates that a lack of diligence on the part of the party proffering the witness contributed to the witness's failure to testify, the court may, in its discretion, decline to permit the party to supplement the record with testimony from that witness. *See Springer*, 134 F.3d at 667 (concluding that the district court had properly found that a witness did not "fall within the category of being unavailable" simply because the plaintiffs had cited "scheduling difficulties" as the reason that the witness did not testify at the administrative hearing); *Marc V. v. N.E. Independent Sch. Dist.*, 455 F.Supp.2d 577, 589 (W.D.Tex. 2006) (declining to permit the plaintiffs to introduce "additional evidence" when the record indicated that such evidence "could have been presented in the administrative hearing through the exercise of diligence" (citing *Jones v. Bd. of Educ. of Washington Cnty.*, 15 F.Supp.2d 783, 786 (D.Md. 1998))), *aff'd*, 242 F.App'x 271 (5th Cir. 2007); *cf. I.M.* ex rel. *C.C. v. Northhampton Pub. Schs.*, --- F.Supp. ----, 2012 WL 1523194, at *4 (D.Mass. Apr. 26, 2012) ("[G]iven Plaintiffs' failure to engage in thorough discovery at the administrative level, the court is disinclined to permit submission of the

newly proffered evidence.   To do otherwise would undercut the importance of the administrative hearing and the emphasis the IDEA places on exhausting administrative remedies before pursuing judicial review.").

Here, Plaintiffs have failed to meet their burden of showing that Dr. Berghman was actually unavailable to testify at the due process hearing.   Their own evidence reveals that they did not subpoena Dr. Berghman until September 6, 2011, just two days before the start of the due process hearing.[21]   An Army official responded in writing the following day, explaining that the Army had to authorize "the appearance of its personnel . . . in private litigation."   (ECF No. 12-3, at 1).[22]   The response also set forth the procedure Plaintiffs had to follow to obtain such authorization and stated that Plaintiffs needed to submit a subpoena signed by a judge, not "a clerk of court" along with

---

[21]  The Code of Maryland Regulations requires that a party file its subpoena requests, "[t]o the extent practicable, . . . at least 10 days before the [due process] hearing."   Md. Code Regs. 28 § 02.01.14.

[22]  The letter also explained that Department of Defense guidelines preclude Army personnel from testifying as "opinion or expert witness[es]" in private litigation.   (ECF No. 12-3, at 1).  Army personnel are thus permitted to testify only as fact witnesses.

the request.   (*Id.*).[23]   Although Plaintiffs answered the letter the same day, they failed to comply with the procedure articulated by the Army,[24] and there is no indication that they ever provided the Army with a subpoena signed by a judge. Plaintiffs have provided no additional information regarding their attempt to subpoena Dr. Berghman.   The record thus indicates that Plaintiffs failed to act diligently in presenting testimony from Dr. Berghman at the due process hearing, warranting denial of their request to take discovery on this issue.[25]

---

[23] Specifically, the response stated that "[t]he request must include the nature of the proceeding, and the nature and relevance of the official information sought." (*Id.*) (citations omitted).

[24] Plaintiffs' response described in detail the nature of the administrative hearing, but it provided little information about "the nature . . . of the official information" Plaintiffs sought to present through Dr. Berghman's testimony.  (*Id.*) In fact, their letter stated only that Dr. Berghman was Y.B's "treating physician," that he had a "long standing relationship with [Y.B.]," and "his testimony [was] a critical part of the [administrative] proceeding." (ECF No. 12-4, at 2).

[25] Plaintiffs' request must also be denied because any testimony they could now obtain from Dr. Berghman would be introduced – admittedly – for the sole purpose of rendering credible his opinion recommending a residential placement for Y.B. (ECF No. 12, at 10-11). (The ALJ chose not to credit Dr. Berghman's recommendation due to numerous unexplained inconsistencies about the time period during which he treated Y.B. and the nature of that treatment.   As explained by the First Circuit, courts must "look with a critical eye on a claim, such as made here, that the credibility of a witness is a

Plaintiffs' request to undertake discovery regarding Y.B.'s placement at the Frost School following the issuance of the ALJ's opinion will also be denied.  According to Plaintiffs, Y.B. "is failing in that day placement," and this evidence demonstrates that his repeated placement in a private day school – rather than a residential setting – was improper.  (ECF No. 12, at 11).  This request is properly analyzed by considering two separate issues:  (1) whether Y.B.'s performance during the 2011-2012 school year has bearing on the propriety of prior year IEPs; and (2) whether Y.B.'s performance at the Frost School beginning in December 2011 is probative of the propriety of his August 2011 IEP recommending placement at the Pathways School.

The Fourth Circuit has expressed skepticism about the relevancy of evidence that arises after the conclusion of an administrative hearing.  *See Schaffer* ex rel. *Schaffer v. Weast*, 554 F.3d 470, 476-78 (4th Cir. 2009) (explaining that "the dangers of post-hearing evidence are significant").  "Judicial review of IEPs under the IDEA is meant to be largely prospective and to focus on a child's needs looking forward."  *Id.* at 477. This prospective review of IEPs would be particularly undermined

---

central issue [in the district court's review of an administrative hearing].  The claim of credibility should not be an 'open sesame' for additional evidence."  *Burlington*, 736 F.2d at 791.

by the admission of evidence about a student's performance for "an entirely different [subsequent] school year." *A.S. v. Trumbull Bd. of Educ.*, 414 F.Supp.2d 152, 171 (D.Conn. 2006); *see also Schaffer*, 554 F.3d at 477 (citing with approval *Bernardsville Bd. of Educ. v. J.H.*, 42 F.3d 149, 161 (3[d] Cir. 1994), for the proposition that "evidence of a later IEP was 'irrelevant to the issue of the appropriateness of' prior IEPs").[26]  Accordingly, evidence of Y.B.'s performance during the 2011-2012 school year is not probative of whether his prior-year IEPs afforded him a FAPE, and Plaintiffs will not be permitted to submit additional evidence regarding this issue.

The discovery Plaintiffs seek regarding Y.B.'s lack of progress at the Frost School would also not be probative of whether the August 2011 IEP recommending placement in a non-public day school provided him with a FAPE.  Once again, Plaintiffs assert that they have a "right" to undertake discovery on this issue (ECF No. 12, at 10), failing to recognize that the court has discretion to determine whether to admit such evidence, *Springer*, 134 F.3d at 666-67.  Y.B.'s IEPs have each provided for ESY services because, as the parties

---

[26] For this reason, Plaintiffs' citation to *Schoenbach v. District of Columbia*, 309 F.Supp.2d 71, 82 (2004), in support of a contrary conclusion is unpersuasive.

agree, his failure to attend classes consistently is likely to result in substantial regression of life skills and an inability to recover those skills in a reasonable amount of time. Here, it is undisputed that Y.B.'s parents declined to submit a referral packet to the Pathways School and that Y.B. was not enrolled in school from mid-August through early December 2011.

Given this significant break in time, it would be speculative at best to conclude that Y.B.'s subsequent failure at the Frost School somehow demonstrates that the August 2011 decision to place him in a private day school – rather than a residential program – was not reasonably calculated to afford him a FAPE. *Cf. Schaffer*, 554 F.3d at 477 (reasoning that "[j]udicial review would simply not be fair to school districts, whose decisions would be judged in hindsight based on later assessments of a student's needs at [a] later point in time" if the court gave significant weight to post-hearing evidence that arose months or years after an administrative hearing); *J.R. v. Bd. of Educ. of City of Rye Sch. Dist.*, 345 F.Supp.2d 386, 395 (S.D.N.Y. 2004) ("[W]e . . . must not engage in Monday-morning quarterbacking guided by our knowledge of [the student]'s subsequent progress at [a particular school], but rather [must] consider the propriety of the IEP with respect to the likelihood that it would benefit [the student] at the time it was

34

devised.").[27]   Accordingly, Plaintiffs' Rule 56(d) request will be denied in its entirety, and the Board's request for summary judgment will be resolved on the administrative record alone.

### d. Plaintiffs' Failure to Identify Any Deficiencies in the ALJ's Opinion in Response to the Board's Request for Summary Judgment

In its motion, the board contends that the court should grant summary judgment in its favor because the ALJ correctly concluded that Y.B.'s placement in a non-public day school for the relevant school years afforded him a FAPE.   "Whether an IEP is . . . sufficient to discharge a school board's obligations under the IDEA is a question of fact."   *Cnty. Sch. Bd. of Henrico Cnty., Va. v. Z.P.* ex rel. *R.P.*, 399 F.3d 298, 309 (4th Cir. 2005); *Heffernan*, 642 F.3d at 485 (same).   Under the IDEA, when an ALJ's factual findings are "regularly made," they are "entitled to a presumption that they are *prima facie* correct," *C.C. v. Fairfax Cnty. Bd. of Educ.*, --- F.Supp.2d ----, 2012 WL 2951631, at *3 (E.D.Va. July 19, 2012) (citing *Z.P.*, 399 F.3d at

---

[27] Because of these circumstances, *Justin G.*, 148 F.Supp.2d 576, a case on which Plaintiffs rely heavily, is distinguishable from the present action.   The *Justin G.* court determined that the school district had committed a procedural violation of the IDEA with respect to one of the school years at issue and thus reached the question of whether the private school placement selected by his parents was adequate.   With respect to this limited question, the court considered additional evidence, pursuant to 20 U.S.C. § 1415(i)(2)(C), consisting of the student's subsequent progress in the private school placement that the student's parents contended was appropriate.

304).   In their opposition papers, Plaintiffs present no reason why the court should conclude that the ALJ's findings were irregularly made.   Beyond their arguments regarding the procedural propriety of summary judgment prior to discovery, which were rejected above, Plaintiffs merely state that the Board's statement of facts mentioned little about Y.B.'s educational progress.   They fail to recognize, however, that it is *their* burden – not the Board's – to set forth evidence demonstrating that the ALJ's findings were not regularly made and, therefore, are not entitled to a presumption of correctness.   *Barnett v. Fairfax Cnty. Sch. Bd.*, 927 F.2d 146, 152 (4th Cir. 1991).

From the evidence introduced at the hearing, the ALJ concluded that the Board's proposed placement for Y.B. at specified non-public day schools during the 2008-2009, 2009-2010, 2010-2011, and 2011-2012 school years would afford him a FAPE.   The Fourth Circuit applies a stringent standard when determining whether a student's placement in a residential facility is necessary for educational purposes.   Only "[i]f the educational benefits which can be provided through residential care are essential for the child to make *any* educational progress at all [is] residential care . . . required under the [IDEA]."   *Burke Cnty. Bd. of Educ. v. Denton*, 895 F.2d 973, 980

(4th Cir. 1990).   The IDEA does not "authorize residential care merely to enhance an *otherwise sufficient day program*."   *Id.* (quoting *Abrahamson v. Hershman*, 701 F.2d 223, 227 (1st Cir. 1983)).   Thus, if a student's medical, social, or emotional problems necessitate the residential placement, and those problems are segregable from the learning process, the local education agency – here, the Board - need not fund that placement.  *Shaw v. Weast*, 364 F.App'x 47, 53 (4th Cir. 2010).

The court's independent review of the record confirms that there was an evidentiary basis for the ALJ's conclusion that Y.B.'s "emotional problems are segregable from his ability to learn," and that the proposed day placements for Y.B. were reasonably calculated to afford him a FAPE, which is all that the IDEA mandates.   (ECF No. 9-2, at 32); *Rowley*, 458 U.S. at 201; *see also Shaw*, 364 F.App'x at 53-54 (affirming the district court's conclusion that a student's emotional disturbance and other mental health issues did not require the school district to provide her with a residential placement).   Indeed, when Y.B. attended school, he received passing grades and advanced from grade to grade.   *See Shaw*, 364 F.App'x at 54 (emphasizing the student's ability to earn credits and pass classes as evidence that "during periods when [her] mental health issues were stabilized, her education progressed"); *Bd. of Educ. of*

*Montgomery Cnty. v. Brett Y.*, 155 F.3d 557, 1998 WL 390553, at *3 (4th Cir. 1998) (table opinion) (concluding that a child's ability to "perform[] well academically when he was at school," coupled with evidence that the request for residential placement was driven by incidents unrelated to his education indicated that placement in a non-residential placement afforded the child a FAPE). "That [Y.B]'s emotional and mental needs [may have] required a certain level of care beyond that provided at [his day schools] does not necessitate a finding that the [Board] should fund that extra care when it [could] adequately address [his] educational needs separately." *Shaw*, 364 F.App'x at 54. The Board's request for summary judgment will, therefore, be granted, and all claims that depend on Y.B.'s placement in a day school – as opposed to a residential school – necessarily fail as a result.

## IV. Conclusion

For the foregoing reasons, the motion for summary judgment filed by Dr. Hite and the Board will be granted. Although the Board's motion seeks judgment on the entirety of Plaintiffs' complaint, it is not entirely clear that the issue of residential/non-residential placement resolves all issues. Plaintiffs will be provided an opportunity to identify any claims raised in their Complaint that remain by submitting a

position notice within fourteen days of the issuance of the attached order.   If necessary, a telephone conference will be convened thereafter.   Otherwise, the case will be closed.

A separate Order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge